USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/2/12

LAW OFFICES OF

# GOLDBERG & DOHAN, L.L.P.

| | | |
|---|---|---|
| GEORGE Z. GOLDBERG*◊+ <br> RUSSELL A. DOHAN+ <br> ——— <br> **From The Office Of:** <br> PENN U. DODSON *◊ <br><br> * Member of the NY Bar <br> ◊ Member of the GA Bar <br> + Member of the FL Bar <br><br> **Additional offices in** <br> Georgia, Florida, Tennessee, Colorado, <br> North Carolina, Alabama, Michigan & South Carolina | Reply to: **NEW YORK** <br><br> WEB ADDRESS: <br> WWW.GOLDBERGDOHAN.COM <br> MAIN TELEPHONE (800) 719-1617 <br> Facsimile (888) 272-8822 | New York / New Jersey Office: <br> 275 Madison Avenue <br> Suite 705 <br> New York, New York 10016 <br> ——— <br> Direct (646) 502-7751 <br><br> Home Office: <br> 1776 North Pine Island Road <br> Suite 224 <br> Plantation, Florida 33322 <br> ——— <br> Direct (954) 318-2888 |

July 2, 2012

Hon. Jesse M. Furman
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

**VIA PDF ATTACHMENT TO EMAIL ONLY** (*Furman_NYSDChambers@nysd.uscourts.gov* \)

Re:   *Perez et al v. Jupada Enterprises Inc. et al*
       Case No. 1:10-cv-03118-RJH
       Supplemental Information for Class Settlement Approval

Your Honor:

   Per your request and direction, the parties provide the following additional information surrounding the proposed motion for approval of a class settlement in the above-referenced case. This letter has been drafted by counsel for the Plaintiffs; Defendants' counsel have reviewed and edited and, where indicated, provided additional comments.

**THE CLASS ACTION FAIRNESS ACT (CAFA) DOES NOT APPLY HERE.**
   Relevant here, in order for CAFA notice requirements to be triggered, the case must involve more than 100 *actual* named plaintiffs or more than $5,000,000 in controversy, both of which are lacking in this case. CAFA applies to:
- any civil action filed under Rule 23 of the Federal Rules of Civil Procedure or a similar state statute or rule of judicial procedure, including Rule 42 of the Texas Rules of Civil Procedure;
- filed after February 17, 2005;
- ***involving aggregate damage claims of more than $5 million***, exclusive of interest and
- costs; and

1

> where any class member is from a different state or foreign jurisdiction than any single defendant (*i.e.,* "complete diversity" is not required).

The Act's removal provisions also apply to "mass actions," which are civil actions involving **more than 100 plaintiffs** (i.e named plaintiffs, not putative class members) whose claims involve common questions of law or fact and who seek monetary relief.[1]

## ATTORNEY FEES

While class counsel are fully willing to be forthcoming with the tribunal, under the law, attorney fees for retaliation cases need not be court approved. However, even characterizing the settlements as a global one in which court approval were implicated, the amount requested here falls squarely within the range of attorney fee recoveries approved by courts in this district.

### COURT APPROVAL PROCESS NOT IMPLICATED IN RETALIATION CLAIMS

As many courts have noted,

> under the FLSA, an employee may not waive or settle claims for unpaid wages unless the settlement is: (1) supervised by the Secretary of Labor or (2) judicially stipulated and approved.

*Bouzzi v. F&J Pine Rest., LLC*, 2012 U.S. Dist. LEXIS 3489 (E.D.N.Y. 2012) (collecting cases)

This approval process, however, does not apply to FLSA retaliation claims (brought under 29 USC § 215(a)(3)). The reasons for this require some historical explanation.

The court approval process is not based on a technical reading of the statutory language but instead has been developed in caselaw. In § 216(b) the FLSA allows for private rights of action for violations of §§ 206, 207, and 215. In § 216(c) the FLSA gives the Secretary of Labor rights to enforce under §§ 206 and 207 and goes on to describe that waivers to these claims occur when the claim is being supervised or brought by the Secretary. Generally revered as the seminal case on the issue of court approval of FLSA settlements, *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352-1353 (11th Cir. 1982) discusses the background and spirit surrounding the very limited circumstances under which waivers of wage claims can occur, concluding that in addition to oversight by the DOL, the only other way that waiver can occur is by court approval.

The underlying presumption fueling that is that the employees sought to be protected by the FLSA generally have substantially less bargaining power than the employer. For a multitude of reasons ranging from the very humanitarian to business protection through the regulation of unfair competitive advantage via underpayment for labor, the requirements to pay minimum wage and overtime are "... mandatory; thus, the provisions are not subject to negotiation or

---

[1] See U.S. Class Action Fairness Act of 2005, 28 U.S.C. Sections 1332(d), 1453, and 1711–1715. Thanks to Thompson & Knight LLP for the concise summary of the requirements, at
http://www.tklaw.com/resources/documents/Client%20Alert%20-%20Class%20Action%20Fairness%20Act.pdf.

2

bargaining between employers and employees." *Lynn's Foods*, 679 F.2d at 1352. It would be antithetical to this concept for an employee and an employer to be able to come to a compromised "agreement" for the employee to accept less than the FLSA mandate. So, for example, if an employee paid at $10/hour were paid straight time; he was owed $500 in back pay, plus $500 for liquidated damages; and after complaining to his employer he agreed to accept $200 in response for letting it go, the FLSA's overtime requirements would have been thwarted – indeed, if anything the employer would be incentivized not to pay overtime and then to simply strike a deal if and when complaints arose. It may be that in some cases the compromise would indeed reflect a fair compromise of a bona fide dispute; however, the law does not trust that to be the case given the power disparities generally at play and therefore requires oversight. Therefore, unless the DOL or a judge has given it the stamp of approval, such waivers are deemed ineffective.

Retaliation claims, by contrast, are a completely different animal simply because the value of even a perfectly *bona fide* retaliation claim is not quantifiable the way minimum wage and overtime claims are. How much is a retaliation claim "worth"? It depends. Maybe zero, maybe a huge amount. The employer's stated nondiscriminatory reason for the adverse action may be valid; punitive damages are available in some jurisdictions but not others; etc. Thus, for example, imagine this: a worker complains about his lack of overtime pay (but was in fact wrong about his understanding and was not actually owed any overtime), is fired in the same conversation, and the next day the employer calls him up and says "I feel bad about yesterday. Tell you what. I will give you severance pay of $500 if you will sign this waiver [of FLSA retaliation claims]." Even if his claim was potentially worth $500,000, it does not violate the FLSA for him to have been paid $500 because there are no requirements for how much need be paid for such a claim the way there are requirements for how much must be paid for minimum wage and overtime. If a week later the employee turned around and sued his former employer in court and the employer defended with the waiver, chances are the court would find the release valid despite its lack of court approval.

After all, if the employee instead of complaining about wages had instead sent a letter to the HR department claiming he had been discriminated against on the basis of race, was fired the same day, and traded a release of all discrimination and discrimination law retaliation claims for $500, there would be no hesitation to enforce such a waiver. While maybe such releases *should* require court approval in the same way wage claims do in order to ensure that employees subjected to power inequalities are in fact treated equally, under the law as it currently stands, such approval just simply is not a requirement.

All that being said, the Plaintiffs here recognize that their retaliation claims did not occur in a factual or jurisprudential vacuum. If, for example, instead of having brought FLSA retaliation claims they had raised Title VII retaliation claims in the same complaint as their class wage claims, the court could have asked for all available information for the purposes not of assessing the retaliation claims unto themselves but for the purpose of assessing whether the

class claims were handled fairly – i.e. to ensure that the class members were not being shorted at the expense of the named plaintiffs.

Thus, the question for the court is really this: of the total amount of money that is trading hands in this case, is the portion going to the class members fair and justified given all the factors at issue here? This analysis should apply whether the higher amounts going to named plaintiffs are characterized as incentive payments for having been willing to step up to the plate, greater extent of the release of claims, additional claims raised (FLSA retaliation or otherwise), or something else.

With all of this background, let's turn back to the case at hand. Here, insurance coverage was implicated for the retaliation claims but not the wage claims. The total amount the insurance company agreed to pay was set. None of that amount could have gone to the class; the only potential recipients of that money were the two named plaintiffs and their lawyer's firm. As a matter of contract, the plaintiffs had agreed to a 45% contingency fee up front in their engagement letters.

### THE AMOUNT SOUGHT IS REASONABLE AND SUPPORTED BY LAW.

If instead of viewing the claims (individual retaliation claims vs. class wage claims) raised as separate and discrete cases we were to look at it all combined, the overall amount of attorney fees being requested would amount to 36% of the overall, total amount recovered in this case. Such an percentage falls well within the amounts that have been approved by courts. *In re Warner Communications Sec. Litigation*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985) ("Traditionally, courts in this Circuit and elsewhere have awarded fees in the 20%-50% range in class actions."), cited by *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 149 (S.D.N.Y. 2010); *Velez v. Novartis Pharms. Corp.*, 2010 U.S. Dist. LEXIS 125945, 58-59 (S.D.N.Y. Nov. 30, 2010) (Noting 20%-50% range; collecting cases, and stating that "District courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater."); *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 533 (E.D. Pa. 1990) ("Courts have allowed attorney compensation ranging from 19 to 45% of the settlement fund created …") While a number of the cases fall toward the lower end of that percentage range, the overwhelming majority of those cases involve millions of dollars. "In general, the percentage of recovery fee should decrease as the size of the fund increases…" *Id.*

For all these reasons as well as those stated previously in motion and by letter, the attorney fees requested here are reasonable and supported by caselaw; we respectfully request that they be approved.

### CONFIDENTIALITY

The restrictions on the confidentiality provisions that some (though by no means all) district courts uphold in FLSA wage cases do not apply to claims brought pursuant to the anti-

retaliation provisions of the FLSA, because, as previously noted, the court approval process does not apply to FLSA retaliation claims.

> There are two independent grounds upon which the presumption of public access attaches to FLSA settlement agreements. First is the general public interest in the content of documents upon which a court's decision is based, including a determination of whether to approve a settlement. Second is the 'private-public character' of employee rights under the FLSA, whereby the public has an 'independent interest in assuring that employees wages are fair and thus do not endanger the national health and well-being.

*Bouzzi* v, 2012 U.S. Dist. LEXIS 3489 at 8-9 (E.D.N.Y. 2012) (internal quotations omitted). In the wage claim aspect of the case, the underlying rationale is that other workers potentially similarly affected have a right to know about the details of the controversy because they too may have similar claims. In the context of the individualized circumstances at issue in the two named plaintiffs' retaliation claims, this is not the case.

Generally speaking, settlement negotiations are, of course, confidential. This policy has arisen out of a desire to foster disclosure and candor to facilitate resolution; exceptions to this general rule should be construed narrowly.

Here, the public's interest would not be served by disclosing each side's contentions about the nuances of their positions as to why the Plaintiffs were terminated. The defendants have put forth positions that are of course at this stage not supported by any evidence but, further, that plaintiffs deem to be not merely untrue but unfairly scandalous and disparaging. The nature of defendants' position even goes so far as to accuse them of actions that in theory could invoke criminal penalties if true. Taking these allegations from the sphere of confidential insinuations made behind closed doors into the light of the public eye would serve only to open a can of worms, cause unfair humiliation to the plaintiffs, and ultimately could stand to create a chilling effect to others wishing to raise similar claims. If the evidence had been exchanged and the facts were determined to be a certain way in court, that would be one thing, but at this stage in proceedings defendants' contentions were no more than unsupported allegations .

For these reasons, Plaintiffs request that none of the information relating to their retaliation claims be part of the public record. However, should this court believe that some portion of the information should be made public, Plaintiffs request that the nature of the allegations being made be fully redacted. Further, Defendants request that the amount of money the named plaintiffs received with respect to the retaliation claims be redacted.

**IMMIGRATION STATUS**

Per the Court's direction, we did add a provision in the Notice relating to immigration status. However, Defendants to want to make note that even though immigration status is not at issue, the IRS still requires settlement proceeds to have the proper withholdings taken, which of

5

course requires either a SSN or TIN.  Here, we hope this will ultimately be a nonissue; however, there is one eligible class member (one who is only entitled to approximately $50 and who has not worked for the restaurant for over 5 years) for whom the Defendants do not have a SSN on file.  If his notice is not deemed Undeliverable, the settlement administrator would have to ask him for his SSN/TIN which conceivably could be considered an immigration-related inquiry.  Should this eventuality occur, we may ask the Court for guidance at that point.

   We hope that these submissions may meet with your approval and thank you for your input and guidance in this process.

               Sincerely,

               Penn Dodson
               *pdodson@goldbergdohan.com*

cc: Christopher Mills, via PDF attachment to email